The Full Commission, with Commissioner Sellers dissenting, filed an Order on 3 February 1998 instructing the parties to obtain independent medical examinations of plaintiff by a rheumatologist and a psychiatrist. The report of Dr. Margaret Dorfman, psychiatrist, was received on 29 May 1998 and is admitted into the evidence of record. The report of Dr. Alan Spanos was received on 20 July 1998 and is also admitted into the evidence of record.
 *************
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner John A. Hedrick, the briefs and arguments on appeal and upon the medical reports submitted subsequent to 26 January 1998. The appealing party has shown good ground to reconsider the evidence. Having reconsidered the evidence of record, the Full Commission reverses the prior Opinion and Award and enters the following Opinion and Award.
 *************
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing on 13 August 1996 as:
 STIPULATIONS
1. The date of plaintiff's alleged injury was 30 May 1995.
2. On that date, the parties were subject to, and bound by, the provisions of the North Carolina Workers' Compensation Act.
3. All parties are properly before the Industrial Commission which has jurisdiction over this matter.
4. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
5. On that date, an employer-employee relationship existed between the parties.
6. Defendant is duly qualified as a self-insured employer.
7. Plaintiff's average weekly wage is to be determined.
8. A Vocational Evaluation Report, marked as Stipulated Exhibit Number Two, is admitted into evidence.
9. A set of plaintiff's medical records received by the Industrial Commission on 23 April 1997, is admitted into evidence.
 EVIDENTIARY RULINGS
The objections appearing in the deposition of Dr. Miller are OVERRULED. A one page computer print out showing medical and disability compensation defendant has paid to or on behalf of plaintiff is ADMITTED into evidence.
 *************
Based upon the evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing on 13 August 1996, plaintiff was a forty-one year old female. Plaintiff has a ninth grade education. Her employment history included work as a carpet installer and as a professional apartment cleaner.
2. Plaintiff began working for defendant approximately eight months prior to 30 May 1995. Plaintiff worked for defendant as a third shift merchandise stocker. Plaintiff was responsible for stocking merchandise throughout defendant's store.
3. On 30 May 1995, at approximately 3:15 a.m., plaintiff was performing her usual duties for defendant. Plaintiff carried a heavy box containing stationery to a cart. When plaintiff lifted the box into the cart she experienced the immediate onset of pain in her left shoulder, back and side. As a result of this incident, plaintiff sustained a musculoskeletal strain.
4. Prior to 30 May 1995, plaintiff had no significant pre-existing medical conditions which would have affected her ability to engage in full-time, competitive employment.
5. The compensability of plaintiff's injury was accepted by defendant through an Industrial Commission Form 21 Agreement for Compensation, which was approved by the Commission on 3 April 1996. Pursuant to this Form 21, plaintiff was to be paid temporary total disability compensation at the rate of $149.61 per week beginning on 7 June 1995 and continuing for necessary weeks.
6. Despite her injury, plaintiff continued to work. She first sought medical treatment on 2 June 1995 from a Doctor's Urgent Care facility. An examination revealed that plaintiff had sustained pulled muscles from the back of her neck downward. Plaintiff was prescribed muscle relaxers and her arm was immobilized with a sling. Plaintiff was removed from work until her next appointment on 5 June 1995 and referred to physical therapy. On 5 June 1995, plaintiff had left shoulder pain and swelling in her left hand which was secondary to her use of the sling. Plaintiff was then removed from work until 9 June 1995.
7. As of 9 June 1995, plaintiff's shoulder pain continued, but she was released to return to light duty work with restrictions of no lifting, pulling or pushing. On 19 June 1995, plaintiff returned to work for defendant and attempted to perform the duties of a light duty position answering telephones.
8. Plaintiff was then referred by defendant to Dr. Lee A. Whitehurst, an orthopedist. Plaintiff was examined by Dr. Whitehurst on 20 June 1995 and reported pain which was worsening despite her physical therapy. Plaintiff also reported that she had not been able to tolerate the sitting required in her light duty position answering telephones. Dr. Whitehurst noted pain in the shoulder, neck and back. At that time, plaintiff was also experiencing panic attacks. Following this examination, Dr. Whitehurst directed plaintiff to discontinue use of her sling, and prescribed intensive rehabilitation. Plaintiff was released to return to sedentary employment within three to four days.
9. During a return visit on 6 July 1995, plaintiff advised Dr. Whitehurst that after some initial improvement, her severe pain had returned. Plaintiff also reported experiencing headaches, blurred vision, nausea and loss of balance. Plaintiff had not been able to work and had been seen in the emergency room at Duke University Medical Center. Despite her continued problems, Dr. Whitehurst found that plaintiff had reached maximum medical improvement, had sustained no permanent partial disability and released her to return to full duty work.
10. During this period of treatment by Dr. Whitehurst, he recommended that plaintiff undergo a cervical fusion procedure. However, plaintiff refused to have this surgery at that time until further testing was performed.
11. Plaintiff then returned to work for defendant and attempted to perform the duties of a stocker, initially working on the third shift. Because of problems with a coworker who also worked on the third shift, plaintiff requested that she be moved to the first shift. Defendant complied with this request and plaintiff was initially informed by her supervisor, Ms. Joyce Gilchrest, that she would retain her regular pay after her move to the first shift. Because there were no stocker positions available on the first shift, plaintiff was moved to a customer service position.
12. After moving to the first shift, plaintiff was informed by Ms. Gilchrest that her pay would be reduced by fifty cents per hour. Thereafter, on or about 30 August 1995, plaintiff was approached by Ms. Deborah Strickland of defendant's personnel department. Ms. Strickland informed plaintiff that her pay would again be reduced and that she had to sign a form accepting this pay reduction "or else." Because of the implied threats by Ms. Strickland, plaintiff signed the pay reduction form.
13. After signing the form, plaintiff discussed the matter with Mr. Freeman, defendant's store manager. Following this meeting with Mr. Freeman, plaintiff was called back to the personnel office by Ms. Strickland. Once plaintiff arrived at the personnel office, Ms. Strickland closed and locked the door and spoke to plaintiff in a threatening manner regarding her meeting with Mr. Freeman. Apparently, Ms. Strickland was angry that plaintiff had discussed the matter with Mr. Freeman and she instructed plaintiff that she was not to report to Mr. Freeman again. Due to Ms. Strickland's actions, tone and statements, plaintiff did not believe she had a job after this meeting.
14. Following her encounter with Ms. Strickland, plaintiff left defendant's premises and did not return until the following Friday, which was a pay day. In order to receive a final pay check, an employee was required to return their uniform shirt. Because plaintiff believed she had been terminated, she brought her uniform shirt when she returned for what she believed would be her final pay check. When plaintiff arrived, Ms. Strickland remarked that it was a good thing plaintiff brought her shirt because otherwise she (Ms. Strickland) could not give plaintiff her check. When plaintiff inquired as to whether she had been terminated, Ms. Strickland thanked her for the shirt and gave plaintiff her final pay check.
15. Plaintiff's testimony regarding the circumstances of her termination by defendant was uncontradicted and is accepted as credible. None of defendant's personnel involved in plaintiff's termination testified at the hearing on 13 August 1996
16. Plaintiff did not voluntarily resign from her position with defendant and reasonably believed that she had been fired based on the actions and statements of Ms. Strickland. Defendant contends that plaintiff's termination was based on her having excessive absences. However, this contention is not accepted as credible and defendant has failed to prove that plaintiff's termination was unrelated to her injury by accident of 30 May 1995.
17. On 22 September 1995, plaintiff sought medical care on her own from Dr. Shelly Miller, a board certified family practitioner. Plaintiff informed Dr. Miller of her work related injury and reported that she had been experiencing headaches, left-side back pain and pain in her left shoulder and arm. Plaintiff also informed Dr. Miller of Dr. Whitehurst's earlier opinion regarding the fusion surgery. Dr. Miller initially diagnosed plaintiff with a cervical and lumbar muscle strain and prescribed muscle relaxants and pain medications. Dr. Miller informed plaintiff that she should return to Dr. Whitehurst for an MRI before a fusion surgery was performed.
18. Plaintiff returned to Dr. Whitehurst on 28 September 1995. An MRI was performed and the results were normal. During this visit, Dr. Whitehurst told plaintiff that she was lazy, out of shape and that she should return to full time work. Dr. Whitehurst also implied that plaintiff was improperly seeking to receive workers' compensation benefits when, in his opinion, she was no longer disabled.
19. Plaintiff returned to Dr. Miller on 9 October 1995 at which time she continued to complain of left-side neck and back pain. On 6 November 1995, Dr. Miller diagnosed plaintiff as having fibromyalgia.
20. In Dr. Miller's opinion, the symptoms for which she has seen and treated plaintiff, including her depression and anxiety, were caused or aggravated by her injury by accident on 30 May 1995. Additionally, Dr. Miller opined that plaintiff has been unable work as the result of her condition since 30 May 1995, with the exception of her attempts to return to work during the summer of 1995.
21. The treatment provided by Dr. Miller was reasonably necessary to effect a cure and/or to provide relief to plaintiff as the result of her 30 May 1995 injury by accident.
22. From 26 March 1996 through 11 June 1996, plaintiff underwent examinations at the Raleigh Vocational Center. A vocational evaluation report from the center was prepared on 19 June 1996. According to this report, based on plaintiff's vocational skills and her physical condition as the result of her 30 May 1995 injury by accident, she was only capable of returning to sedentary work with restrictions of not lifting more than ten to fifteen (10-15) pounds.
23. An independent psychiatric evaluation of plaintiff was completed by Dr. Margaret J. Dorfman. Her report was submitted on 12 May 1998 and has been entered into the evidence of record. In Dr. Dorfman's opinion, plaintiff's psychiatric symptoms were significantly exacerbated and she has developed a major depression as a result of her injury by accident on 30 May 1995.
24. An independent medical examination of plaintiff was completed by Dr. Alan Spanos, who prepared a report dated 13 July 1998. Dr. Spanos' report has been entered into the evidence of record. Dr. Spanos diagnosed plaintiff as suffering from post-traumatic widespread pain syndrome with features of fibromyalgia syndrome and neuropathic pain, supervening on a regional pain syndrome reflecting musculoskeletal and neuropathic disfunction in the neck and upper left quarter. Dr. Spanos also diagnosed plaintiff as suffering from panic attacks, depression, headache, irritable bowel syndrome and probable gastroesophageal reflux disease.
25. Dr. Spanos opined that plaintiff's present condition was either caused or significantly aggravated or accelerated by her injury by accident on 30 May 1995 and that she will require future medical treatment.
26. Based upon the medical opinions of Dr. Miller, Dr. Dorfman and Dr. Spanos, the opinion of Dr. Whitehurst that plaintiff had reached maximum medical improvement and was able to return to work as of 6 July 1995 is not given any weight. At that time, plaintiff's condition and symptoms had not been correctly diagnosed. Furthermore, the opinions of Dr. Miller, Dr. Dorfman and Dr. Spanos are given greater weight than the opinions of Dr. Whitehurst.
27. Based upon the credible medical evidence now available, plaintiff did not reach maximum medical improvement on 6 July 1995. As of that date, plaintiff's conditions had not been correctly diagnosed and her failed attempts to return to work thereafter should have been treated as an unsuccessful trial return to work. An Industrial Commission Form 28U was signed by Dr. Miller on 5 February 1996. On this form, Dr. Miller certified that plaintiff was unable to continue working for defendant after 30 August 1995 as the result of her 30 May 1995 injury by accident. At that time, Dr. Miller was not plaintiff's authorized treating physician. However, given that Dr. Whitehurst had failed to correctly diagnosed plaintiff's conditions, Dr. Miller's opinion and the other information contained on this Form 28U serve as credible evidence supporting the fact that plaintiff's failed attempts to return to work should have been treated as an unsuccessful trial return to work.
28. Plaintiff's fibromyalgia, related pain syndromes and her musculoskeletal and neuropathic disfunctions as diagnosed by Dr. Spanos, were caused or significantly aggravated by her injury by accident on 30 May 1995.
29. Plaintiff's psychiatric problems, panic attacks and depression as diagnosed by Dr. Dorfman, were caused or significantly aggravated by her injury by accident on 30 May 1995.
30. As the result of her injury by accident on 30 May 1995, plaintiff has been incapable of earning wages in her former position with defendant or in any other employment from 30 August 1995 through the present and continuing.
31. As the result of her injury by accident on 30 May 1995, plaintiff will require future medical care for the treatment of her conditions, including her fibromyalgia and depression.
32. Plaintiff's average weekly wage on 30 May 1995 was $224.42, yielding a compensation rate of $149.61.
33. Counsel for plaintiff requests an attorney's fee in the amount of thirty-three and one-third percent (33 1/3%) of the compensation awarded in this matter, rather than the usual and customary rate of twenty-five percent (25%) for claims reaching the Full Commission level. Based upon the amount and type of work performed in pursuit of plaintiff's claim, counsel for plaintiff's request for a thirty-three and one-third percent (33 1/3%) attorney's fee is unreasonable.
 *************
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage on 30 May 1995 was $224.42, yielding a compensation rate of $149.61. G.S. § 97-2(5).
2. Plaintiff's fibromyalgia, related pain syndromes and her musculoskeletal and neuropathic disfunctions were caused or significantly aggravated by her injury by accident on 30 May 1995. G.S. § 97-2(6). Plaintiff's psychiatric problems, panic attacks and depression were caused or significantly aggravated by her injury by accident on 30 May 1995. Id.
3. The Industrial Commission Form 21 Agreement for Compensation, which was approved by the Commission on 3 April 1996, created a presumption of continued disability in plaintiff's favor. G.S. § 97-2(6); G.S. § 97-29; Kisiah v. W.R. KisiahPlumbing, 124 N.C. App. 72, 476 S.E.2d 434 (1996), disc. rev.denied, 345 N.C. 343, 483 S.E.2d 169 (1997).
Defendant has failed to rebut this presumption. Id. Upon plaintiff's unsuccessful trial return to work, benefits should have been reinstated by defendant as of 30 August 1995. G.S. § 97-32.1.
4. As a result of her injury by accident on 30 May 1995, plaintiff is entitled to be paid by defendant temporary total disability compensation at the rate of $149.61 per week for the period of 30 August 1995 through the present and continuing until such time as plaintiff returns to work or until further order of the Commission. G.S. § 97-29.
5. As a result of her injury by accident on 30 May 1995, plaintiff is entitled to have defendant pay for all related medical expenses incurred or to be incurred, including expenses related to her treatment by Dr. Miller and for the independent medical examinations performed by Dr. Dorfman and Dr. Spanos. G.S. § 97-2(19); G.S. § 97-25; G.S. § 97-25.1.
6. Based upon the usual and customary fee awarded to attorney's for pursuing claims which reach the Full Commission level, counsel for plaintiff is entitled to an attorney's fee of twenty-five percent (25%) of the compensation to which plaintiff is entitled. G.S. § 97-90.
 *************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the rate of $149.61 per week for the period of 30 August 1995 through the present and continuing until such time as plaintiff returns to work or until further order of the Commission. From the amounts having accrued, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her injury by accident on 30 May 1995, including expenses related to her treatment by Dr. Miller. Defendant shall also pay for the expenses related to the independent medical examination performed by Dr. Dorfman, totaling $814.00, and for the expenses related to the independent medical examination performed by Dr. Spanos, totaling $850.00.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff is approved for counsel for plaintiff. From the amounts having accrued, this fee shall be deducted from the amounts owed to plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. Defendant shall pay the costs.
 S/ ________________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/ ______________________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
S/ ______________________ DIANNE C. SELLERS COMMISSIONER